Louis T. JOHNSON, Petitioner,

v.

**DEPARTMENT OF TRANSPORTA-TION, FAA, Respondent.**

**Appeal No. 83–664.**

United States Court of Appeals, Federal Circuit.

May 18, 1984.

whether in affirming the decision of the Federal Aviation Administration (Administration) removing the petitioner from his position as an air traffic controller for participation in the illegal air traffic controllers' strike in August 1981, the Board properly rejected the petitioner's contention that his absence from work during the strike resulted from his having been coerced rather than his voluntary participation in the strike. The two other issues we address are whether the Administration's decision was flawed because the agency failed to show a nexus between the petitioner's participation in the strike and the efficiency of the service, and whether the Board's decision was invalid because only one member of the Board signed the opinion. We affirm the Board.

Julian A. Wilhelm, Washington, D.C., argued for petitioners. With him on the brief were J. Thomas Burch, Jr., and David W. McDonald, Washington, D.C.

Sandra P. Spooner, Washington, D.C., argued for respondent. With her on the brief were J. Paul McGrath, Asst. Atty. Gen., and David M. Cohen, Director, Washington, D.C.

Joseph B. Scott, Washington, D.C., Donald L. Cox, Louisville, Ky., and Richard Frank, Tampa, Fla., were on the brief for amicus curiae.

Evangeline W. Swift, Gen. Counsel, Mary L. Jennings and David C. Kane, Washington, D.C., was on the statement in lieu of brief for the Merit Systems Protection Bd.

Stephen C. Cooper and Steven Z. Cohen, Southfield, Mich., were on the brief for amicus curiae on behalf of petitioner.

Before MARKEY, Chief Judge, and FRIEDMAN, RICH, SMITH and NIES, Circuit Judges.

FRIEDMAN, Circuit Judge.

The principal issue in this case, which is on a petition to review a decision of the Merit Systems Protection Board (Board), is

I

The facts relating to the nationwide air traffic controllers' strike are set forth in our opinion in *Schapansky v. Department of Transportation, FAA,* 735 F.2d 477, decided today. In brief, they are that a strike of the Professional Air Traffic Controllers Organization (PATCO) called began at 7 a.m. on August 3, 1981. At 11 a.m. on that date the President announced that the strike was illegal and that any striking controllers who had not returned to work by 11 a.m. on August 5, would lose their jobs.

August 3 and 4, the first days of the strike, were petitioner Johnson's regular days off. Johnson did not report for work on his scheduled shift on August 5, 1981, or attempt to get in touch with his supervisor on that day or the preceding day to explain his absence. There is evidence in the record that Johnson was on the picket line on August 3–6 and on August 8, and that on some of those days he carried a sign reading "PATCO on strike."

On August 7, 1981, Johnson received a letter from the Administration dated August 6, 1981, proposing to remove him for striking on August 5, 1981, and for absence without leave on that day. The following

day, August 8, 1981, Johnson called his supervisor and asked if he could return to work. His supervisor told Johnson that he could not return to work because he had missed his shift on the August 5 deadline the President had set, but suggested that he make an oral response to the proposed removal. The petitioner requested that his oral response be scheduled at a time when no picketers could see him enter the facility, and the agency did so.

According to the testimony at the subsequent Board hearing, at his oral response (made on August 9 or 10) Johnson stated that the reason he failed to report for work on August 5 was not his participation in the strike but fear for his own safety and that of his family. Johnson described an incident in late June, in which he argued with Jim Welsh, a controller known for his hot temper, about the propriety of a strike by PATCO. Welsh indicated that he believed that anyone who did not support the strike could not be considered a member of the human race. When Johnson suggested that they not discuss the subject while on duty, Welsh responded that he never wanted to speak to Johnson again. Johnson characterized Welsh's behavior as "menacing."

Johnson also referred to a conversation he had "overheard in early June of 1981, about 'scabs' [in the coal fields of West Virginia] ending up with bullet holes in them." He further stated that on two occasions, other controllers engaged him in lengthy, but calm, discussions in which they advocated strike participation. Finally, on the day of his oral response, his supervisor told Johnson that another controller had overheard a conversation on the citizen's band radio (CB) in which yet another controller had reported that the petitioner was on his way to the air traffic control center. Another voice on the CB radio replied that he knew where Johnson lived and that he would "take care of it." At the time of the oral reply, Johnson moved his wife and children to an "undisclosed location" for their protection.

In addition to these incidents, Johnson and his wife were not getting along and had separated in the spring of 1981. Johnson also had serious and painful major dental work done on July 23 and 31, 1981, resulting from an abscess, which required him to take a strong painkiller.

Following Johnson's oral response and his written reply, the Administration found that the charges of striking and absence without leave are "fully supported by the evidence and warrant your removal to promote the efficiency of the service," and removed him.

Johnson appealed to the Board. After a hearing, the presiding official of the Board's regional office reversed the removal, on the ground that Johnson had not struck but merely had been absent without leave. She substituted for the Administration's penalty of removal a suspension of two days, equal to the time Johnson had been absent without leave.

The presiding official described Johnson as "an extremely credible witness" and stated that his "own testimony is corroborated by the testimony of credible witnesses." She noted that Johnson's "team supervisor testified that appellant's emotional condition shortly before the strike was beginning to affect his work. When he talked to the appellant on August 8, 1981, the appellant gave him the impression he thought his life might be in danger. The supervisor testified that he felt the appellant was genuinely afraid. In addition, appellant called to testify four working air traffic controllers who indicated to varying degrees that appellant had reported his fears to them."

> The presiding official pointed out that none of the type of retaliation appellant anticipated ever occurred at this facility. This establishes that, with hindsight, appellant's fear was not a reasonable one. It does not, however, diminish the strong testimony that appellant acted upon a fear which, in his emotional state, was reasonable to him.

She concluded that:

> The term "strike" or "striking" has been interpreted to mean an actual refusal in

concert with others to provide services to one's employer. *United Federation of Postal Clerks v. Blount,* 325 F.Supp. 879, 884 (D.D.C.), *aff'd,* 404 U.S. 802 [92 S.Ct. 80, 30 L.Ed.2d 38] (1971). I find that appellant did not withhold his services in concert with others. Rather, he involuntarily stayed away from work because of a fear for his personal safety and that of his family. The appellant has successfully rebutted the agency's *prima facie* showing, and charge number one (1) [striking] is not sustained.

On the Administration's appeal, the Board reversed the presiding official's decision and reinstated the agency's removal action. The Board held that the presiding official applied an incorrect standard in determining that Johnson's absence from work was the result of coercion and that under the correct standard "the coercion defense has not been established and, thus, the *prima facie* showing of appellant's strike participation has not been rebutted."

The Board rejected as "the appropriate standard for establishing a defense of coercion or duress," either the standard in criminal cases (threat of imminent death or personal bodily injury that the actor could not avoid) or that in civil cases generally (threats of most kinds of injury to persons or property). The Board adopted the following standard:

> [I]n order for a federal employee charged with participation in a strike against the Government to establish a defense of coercion or duress, he must demonstrate, by a preponderance of the evidence, that his failure to report for work was the result of a threat or other intimidating conduct, directed toward him, sufficient to instill in him a reasonable fear of physical danger to himself or others, which a person of ordinary firmness would not be expected to resist.

The Board explained that its

> test for determining the existence of duress is an objective one based on an assessment of the actions of a reasonable person under like circumstances. Thus, while the individual circumstances surrounding appellant's conduct may be considered, the ultimate issue to be resolved is whether or not a reasonable person under those circumstances could have been expected to resist the alleged coercion. Such a determination requires the introduction of some objective evidence.

(Footnotes omitted.)

The Board noted that "allegations of menacing tones or language, fear of 'financial ruin' or jeopardy to career advancement, exuberant moral suasion, or any vexation, annoyance or pressure resulting in a state of mental perturbation, reluctance to act or a choice of inherently unpleasant situations, may not suffice to render involuntary appellant's alleged participation in this case." (Footnotes omitted.) The Board

> conclude[d] that the appellant has provided insufficient evidence to support a finding of duress under the standard set forth above. While it is apparent from the record that appellant was subjected to personal and professional pressures during the period in question, he has not met the standard for establishing coercion....
>
> Appellant's proffered evidence of coercion and intimidation before and during the days of his absence consists of those moral exhortations, overheard statements and generalized threats which we have herein rejected as insufficient foundations for a finding of duress....
>
> While it is clear that appellant was emotionally perturbed and reluctant to act as he did, he has not demonstrated that he was the object of such personal threats or other intimidating actions sufficient to instill in him a fear of harm to himself or others which a reasonable person could not have been expected to resist. Therefore, we find that appellant has not rebutted the agency's *prima facie* case of his participation in the strike.

(Footnote omitted.)

## II

In *Schapansky* we have held that the government establishes a *prima facie* case

of strike participation by showing (1) the existence of a strike of general knowledge, and (2) the employee's unauthorized and unexplained absence from work during the strike. We further held that once the government had made that showing, "the burden of going forward with evidence to rebut that showing necessarily shifts to the employee ...." *Schapansky*, at 482. We noted that the amount of evidence the employee must introduce in order to rebut the *prima facie* case may vary depending upon the support for that case.

In the present case, as in *Schapansky*, the government's *prima facie* case was "more than minimally supported." *Schapansky*, at 482. The Board noted that there was additional evidence of Johnson's participation in the strike: (1) his appearance more than once on the picket line, (2) his carrying of a strike sign, (3) the fact that he did not get in touch with his agency to explain or justify his absence from work until two days after he had missed his scheduled work assignment and the day after he had received the notice of proposed removal, and (4) the statement in his oral and written replies to the removal notice that he had made a "poor decision" to stay away from work and that if it had not been for the pressures to which he had been subjected, he would not have made his "unfortunate decision," but would have made the "just and reasonable decision of not joining in this illegal job action." In these circumstances, Johnson had to adduce significant and convincing evidence to rebut the government's *prima facie* case.

The basic issue on this aspect of the case is what kind of showing Johnson was required to make. The presiding official adopted a subjective test of coercion: It was enough that Johnson "acted upon a fear which, in his emotional state, was reasonable to him" even though it was established "with hindsight, [that Johnson's] fear was not a reasonable one." Applying that standard of coercion, she concluded that Johnson "did not withhold his services in concert with others. Rather, he involuntarily stayed away from work because of a fear for his personal safety and that of his family."

The Board, however, adopted an objective standard of coercion: The employee must establish that his failure to work "was the result of a threat or other intimidating conduct" that gives him a "reasonable fear of physical danger to himself or others, which a person of ordinary firmness would not be expected to resist." Applying this standard of the reaction of a person "of ordinary firmness," the Board concluded that although Johnson had been "subjected to personal and professional pressures," the evidence he submitted, showing only "moral exhortations, overheard statements and generalized threats," was "insufficient foundation[ ] for a finding of duress."

Although the Board framed its standard in terms of how a person of "ordinary firmness" would have reacted to the threats and pressures to which Johnson was subjected, this was a restatement of the traditional "reasonable man" standard that the law frequently applies. That is an objective standard that looks to the behavior of the normal, reasonable person and not to subjective reactions of the particular actor that may result from a variety of peculiar circumstances. The Board itself so viewed its standard, since it stated it was applying an "objective" test "based on an assessment of the actions of a reasonable person under like circumstances."

In a case in which an employee contended that his seemingly voluntary resignation had been coerced, the Court of Claims ruled: "Duress is not measured by an employee's subjective evaluation of a situation. Rather, the test is an objective one." *Christie v. United States*, 518 F.2d 584, 587, 207 Ct.Cl. 333 (1975). Arguably, the present case is distinguishable from that case because the claim of duress as a defense to a charge of striking against the government involves a different issue from the claim that a seemingly voluntary resignation was in fact involuntary because it was the product of agency coercion.

Participation in a strike has been defined authoritatively as "an actual refusal in concert with others to provide services to one's employer." *United Federation of Postal Clerks v. Blount*, 325 F.Supp. 879, 884 (D.D.C.), *aff'd mem.*, 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971). If an employee refuses to work because of perceived threats or danger, it could be said that the element of acting in concert with others is missing, and that this is so, whether or not the employee's fears were those a reasonable person would have had in the circumstances. In other words, a showing that an employee believed himself threatened, even if that belief was unreasonable, negates an essential element of the offense of striking against the government. That was the rationale of the presiding official.

In both kinds of cases, however, the issue is whether the employee's action was taken voluntarily or was the result of pressures that made it involuntary. An employee whose seemingly voluntary resignation was in fact coerced is in no different position than an employee whose absence from work during a strike resulted from coercion.

A resigning employee whose resignation was coerced is treated as not having resigned; a "striking" employee whose strike participation was coerced is treated as not having struck. It is immaterial that in the latter case the coercion came from persons outside the government, whereas in the former case it came from the government itself. In both situations the critical inquiry is whether the employee's action was voluntary or involuntary. The presiding official apparently recognized that that was the touchstone for determining whether Johnson had participated in an illegal strike against the government, since she ruled that he "involuntarily" stayed away from work because of fear.

▪ Considering all the circumstances, we cannot say that the Board abused its discretion or committed legal error in adopting the standard it did for evaluating a coercion or duress defense to a charge of striking against the government. Nor can we conclude that the Board improperly applied that standard to the facts here in holding that Johnson's evidence of coercion did not overcome the Administration's *prima facie* case that Johnson had participated in a strike against the government.

As noted, there was significant evidence of Johnson's participation in the strike in addition to the *prima facie* case established by his unexplained and unexcused absence during the strike. He joined the picket line on several days—conduct that alone may suffice to establish striking. *See American Postal Workers Union v. United States Postal Service*, 682 F.2d 1280, 1284 (9th Cir.1982). He offered no explanation for his participation in the picketing.

The presiding official ruled that Johnson's fear was not reasonable. We accept the Board's determination that although the acts that caused Johnson's fear may have made him "emotionally perturbed and reluctant to act as he did," it was not the kind of fear that "a reasonable person could not have been expected to resist."

### III

Johnson contends that the Administration has not established the nexus between the offense of striking against the government and the "efficiency of the service" which, under *Douglas v. Veterans Administration*, 5 M.S.P.B. 313 (1981), is one of the elements the Agency must prove in order to sustain an adverse action. He argues that his termination cannot stand because the Administration produced no evidence that his striking adversely affected his ability to return to the Administration and be a productive employee.

▪ The argument borders on the frivolous. The issue of nexus usually arises when disciplinary action has been taken against an employee because of off-duty conduct not directly related to his duties. *See, e.g., Young v. Hampton*, 568 F.2d 1253 (7th Cir.1977). In such cases the issue is whether the misconduct had a sufficient relationship to the agency's opera-

tions that the disciplinary action "will promote the efficiency of the service." 5 U.S.C. § 7503(a) (1982). In the present case, in contrast, the offense not only directly involved the performance of Johnson's duties, but made it impossible for him to perform them.

 It is difficult to think of conduct that has a clearer nexus to the efficiency of the service than participating in an illegal strike against the government that totally prevents the employee from performing his work. This is one of those cases in which evidence of nexus is unnecessary because "the nature of the misconduct 'speak[s] for itself.'" *Masino v. United States,* 589 F.2d 1048, 1055, 218 Ct.Cl. 531 (1978); *see Hayes v. Department of the Navy,* 727 F.2d 1535, 1539 (Fed.Cir.1984).

### IV

Johnson also contends that the decision of the Board was invalid because the opinion was signed by only one of the three members of the Board. The individual Board member signed "FOR THE BOARD," and an internal decision sheet of the Board shows that all three members "adopt[ed]" the opinion. We know of no statute, regulation, decision, or principle that requires all members of an agency who join in an opinion to sign it. Indeed, orders of three-judge panels of this court customarily are signed by a single judge "FOR THE COURT"—the identical form of decision the Board used in this case.

### V

Johnson challenges the Board's decision on several other grounds, all of which have been considered and rejected in one of the other air traffic controller cases we are deciding today. There is accordingly no need to address them here.

### CONCLUSION

The order of the Merit Systems Protection Board sustaining the Federal Aviation Administration's removal of petitioner Johnson from his position as an air traffic controller is affirmed.

AFFIRMED.

RICH, Circuit Judge, concurs in the result.